## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
_____

BENFIELD, INC.,
a Delaware corporation; and
BENFIELD HOLDINGS, INC.,
a Delaware corporation;

        Plaintiffs,

v.

DAVID MOLINE, an individual;
and MARK HAGEN, an individual;
and JOHN B. COLLINS ASSOCIATES, INC.,

        Defendants,

**MEMORANDUM OF LAW & ORDER**

Civil File No. 04-3513 (MJD/SRN)

_____

Robin Caneff Gipson, Gregory James Stenmoe and Timothy Robert Thornton, Briggs & Morgan, and Wendy J. Wildung, Faegre & Benson, Counsel for Plaintiffs Benfield, Inc., and Benfield Holdings, Inc.

Ansis V. Viksnins and Reuben A. Mjaanes, Lindquist & Vennum, PLLP, Counsel for Defendants David Moline, Mark Hagen, and John B. Collins Associates, Inc.

_____

## I.  INTRODUCTION

This matter is before the Court on Plaintiffs' Motion to Strike Defendants' Unclean Hands Defense and for Summary Judgment on Defendants' Remaining Counterclaims [Docket No. 122]; Defendants' Motion for Summary Judgment [Docket No. 163]; and Plaintiffs' Motion for Partial Summary Judgment on Issue of Conversion of Benfield's Brokerage Commissions [Docket No. 192].  The Court

heard oral argument on November 30, 2005.

## II.   FACTUAL BACKGROUND

### A.   Underlying Facts

Plaintiffs Benfield, Inc. and Benfield Holdings, Inc. (collectively "Benfield"), are wholly owned subsidiaries of Benfield Group Limited. Plaintiffs broker reinsurance to insurance companies to assist them in managing their risk. Defendant David Moline was a senior vice president of Benfield, and Defendant Mark Hagen was a vice president of Benfield. Moline and Hagen worked with Benfield employees Janna Hepper and Beth Briner on a six-person brokerage team at Benfield.

During their employment with Benfield, Moline and Hagen were development brokers, primarily responsible for servicing and maintaining Benfield's existing clients. On July 29, 2004, Moline tendered his resignation, along with those of Hagen, Hepper, and Briner, to Benfield. The resignations were effective immediately. All four employees immediately began working for Defendant John B. Collins Associates, Inc. ("Collins"), a rival reinsurance intermediary.

Both Moline and Hagen were parties to certain employment contracts with Benfield, including restrictive covenants and confidentiality agreements. Moline's Confidentiality Agreement and Restrictive Covenant states that for one year

following termination of his employment with Benfield, Moline cannot, directly or

indirectly,

> (a) except for the benefit of the Company, solicit business of, make
> sales calls on, make introductions to, or accept business from, in the
> United States, entities who were customers of the Company and with
> whom [Moline] had significant contact, or who were identified as
> prospective customers of the Company by [Moline] or at his
> direction, at any time within the one-year period after the End of
> Employment Date, for products or services the same or similar to
> those offered, sold, produced or under development by the Company,
> or dealt in by [Moline], during his employment with the Company;
>
> * * *
>
> (c) solicit for any business endeavor any employee of the Company
> employed by the Company on the End of Employment.

(Moline Confidentiality Agreement and Restrictive Covenant § 2.)  The

Agreement further states that Moline may not "reveal, report, publish, transfer or

otherwise disclose to any person or entity, or use" Benfield's confidential

information.  (Id. § 1.)  Moline was also party to an Employment Agreement that

automatically continued "unless Employer or Executive gives notice of his or its

intention not to so continue, not less than thirty (30) days prior to the end of the

initial term or any subsequent continuation period."  (Moline Employment

Agreement ¶ 1.)

Hagen's Confidentiality Agreement and Restrictive Covenant states that for

one year following termination of his employment with Benfield, Hagen cannot,

directly or indirectly,

(a) except for the benefit of the Company, solicit business of, make sales calls on, make introductions to, accept business from, or provide services to, in the United States, entities who were customers of the Company and with whom [Hagen] had significant contact, or who were identified as prospective customers of the Company by [Hagen] or at [Hagen's] direction, at any time within the one-year period prior to the End of Employment Date, for products or services the same or similar to those offered, sold, produced or under development by the Company, or dealt in by [Hagen], during [Hagen's] employment with the Company; or

* * *

(c) (1) hire or attempt to hire any then-current employee of the Company, (2) hire or attempt to hire any former employee of the Company during their Cooling Off Period, or (3) otherwise solicit or cause any such current or former employee to leave the employ of the Company.  "Cooling Off Period" means the sixty-one (61) day period after an employee's employment with the Company ends.

(Hagen Confidentiality Agreement and Restrictive Covenant § 2.)  The Agreement further states that he will not "reveal, report, publish, transfer or otherwise disclose to any person or entity, or use" Benfield's confidential information.  (Id. § 1.)  Hagen was also party to an Employment Agreement that automatically continued "unless Employer or Employee gives notice of its intention not to so continue, not less than thirty (30) days prior to the end of the initial term or any subsequent continuation period."  (Hagen Employment Agreement ¶ 1.)

In August 2004, Plaintiffs filed a Complaint and a motion for a temporary restraining order, seeking to enforce Moline's and Hagen's employment contracts and restrictive covenants.  On August 10, the Court issued a Temporary

Restraining Order enjoining Moline and Hagen.  On December 29, the Court
granted Plaintiffs' motion for a preliminary injunction.

In the Preliminary Injunction, the Court enjoined Moline from soliciting the
business of, making sales calls on, making introductions to, or accepting the
business of any of Moline's former Benfield customers.  However, Moline was not
enjoined from servicing the accounts of such customers who had already moved
their accounts to Collins.  Hagen was enjoined from soliciting the business of,
making sales calls on, making introductions to, accepting the business of, or
providing services to any of Hagen's former Benfield customers.

Both Moline and Hagen were enjoined from soliciting Benfield's employees
to engage in other business endeavors, such as working at Collins.  Both were also
enjoined from using Benfield's confidential business information for their own
benefit or the benefit of a third-party, or in any other manner disclosing this
information.  Finally, the Court refused to issue a preliminary injunction against
Collins on the basis of Plaintiffs' tortious interference of contract claim against it
because there was insufficient evidence that Collins had committed any legal
wrong.  The Preliminary Injunction remained in effect until July 29, 2005.

In the week following July 29, 2004, six former Moline and Hagen clients
transferred their business to Collins for some period of time: Georgia Casualty &
Surety Company, Association Casualty Insurance Company, Insurance Corporation

5

of Hannover ("ICH"), Wisconsin American Mutual Insurance Company, Founders Insurance Company, and Diversified Casualty Company, Ltd.

Both Association Casualty and Georgia Casualty initially switched their accounts to Collins on July 30, 2004, but ultimately decided to remain with Benfield.  ICH initially appointed Collins its broker of record on August 3, 2004.  After internal maneuvering within ICH and communications between ICH and Benfield, ICH decided to appoint Collins as its broker of record, but while Collins would service the accounts, Benfield would receive all brokerage revenue on the accounts through April 30, 2005.  Both Benfield and Collins would then compete for ICH's work beginning in May 2005.  ICH announced this arrangement on October 13, 2004.  Wisconsin American, Founders, and Diversified Casualty all decided to remain with Collins.

### B.    Motions Currently Before the Court

Plaintiffs move for partial summary judgment on liability on Count XII, Conversion (Benfield v. Collins).  Defendants move for summary judgment on all of Plaintiffs' claims.

Plaintiffs also move for summary judgment on the following counterclaims: Count I, Failure to Pay All Wages Due (Moline v. Benfield) and Count II, Defamation Per Se (Moline and Hagen v. Benfield).  (The Court previously dismissed Counts III and IV of Defendants' Counterclaims.  (Feb. 23, 2005 Order

6

[Docket No. 95].))  Finally, Plaintiffs move to strike Defendants' affirmative defense of unclean hands.  Although they entitle their motion a motion to "strike," the parties argue the motion as one for summary judgment and rely on evidence outside of the pleadings.

## III.   DISCUSSION

### A.   Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341  (8th Cir. 1994) (citation omitted).

### B.   Counts I and II, Breach of Contract (Benfield v. Moline, Hagen)

In Counts I and II of the Amended Complaint, Plaintiffs assert that Moline and Hagen breached their Employment Agreements and Restrictive Covenants with Benfield by 1) soliciting Benfield employees; 2) soliciting clients; 3) using and disclosing confidential information; and 4) failing to give thirty-day notice of

their resignations.   Defendants now move for summary judgment on these counts.

### 1.    Elements of Breach of Contract Claims

To prevail on their breach of contract claims, Plaintiffs must prove "(1)
formation of a contract; (2) performance by plaintiff of any conditions precedent;
(3) a material breach of the contract by defendant; and (4) damages." Parkhill v.
Minn. Mut. Life Ins. Co., 174 F. Supp. 2d 951, 961 (D. Minn. 2000) (citations
omitted).   The parties dispute whether Moline and Hagen materially breached
their contracts.

### 2.    Solicitation of Benfield Employees

#### a.    Facts Underlying Solicitation Claim

##### i.    Moline

When discussing a possible employment opportunity with Moline, Collins'
head of the property and casualty unit in Minneapolis, Mike Joyce, asked Moline
"who he was working with, and what kind of employees were they." Moline
identified Hagen, Hepper, and Briner and stated that they were good employees.
Although Moline and Collins discussed bringing the entire team to work at Collins,
Moline told Joyce that he would not recruit them or promote a switch to Collins.

Briner never communicated her acceptance of the Collins offer directly to
Collins.   Instead, she communicated her acceptance to Moline.

Moline and Hagen told Hepper that they were considering jobs at Collins

and that Collins would call her about a similar opportunity.  Moline told Hepper that he was considering leaving Benfield and that he enjoyed working with her.

Moline told Briner that she might be getting a call from someone interested in employing her, "but that it was [her] choice, that [she] had to make up [her] own decisions."  After Briner received a voice mail from Mike Joyce that did not identify Collins as his employer, she asked Moline which company Joyce worked for, and Moline told her it was Collins.  Moline also told her that he was likely to go to Collins, "but he wasn't sure, and he reiterated that he couldn't tell [Briner] what to do."

Moline told Joyce that he wanted to start work at Collins on July 29, 2004. Joyce then told Hagen, Briner, and Hepper to start on that date as well.

### ii.    Hagen

Collins solicited Hagen separately from Moline.  It had unsuccessfully tried to hire him two years earlier.  When Joyce and Hagen discussed possible employment, they did not discuss Moline.  Later, Moline and Hagen told Hepper that they were considering jobs at Collins and that Collins would call her about a similar opportunity.

### b.    Discussion

Solicitation is "the act or an instance of requesting or seeking to obtain something; a request or petition."  Black's Law Dictionary 1427 (8th ed. 2004).

The Court grants Defendants' motion for summary judgment as to Hagen. There is no evidence that Hagen attempted to persuade Hepper or Briner to leave Benfield to work for Collins.

The Court denies Defendants' motion for summary judgment as to Moline. Viewing the facts in the light most favorable to Plaintiffs, Moline identified appropriate targets to Collins, made statements to his subordinates, while still a Benfield employee, that could be interpreted as encouraging them to work for Collins, picked the departure date that the entire team used, and acted as Collins' agent in accepting Briner's acceptance of the Collins job. These facts may support an inference of solicitation.

### 3.    Solicitation of Clients

### a.    Facts Underlying Client Solicitation Claim

While still employed by Benfield, during June or July of 2004, Moline informed ICH that he was "thinking of resigning" and was "generally not happy where [he] was working anymore and [he] needed a change." During that same time period, he told Wisconsin American that he "wasn't happy where [he] was working and [he] was thinking of leaving" or that he might be making a shift. He also told contacts at Georgia Casualty and Diversified Casualty that he was considering leaving. Hagen told Founders that he "was potentially looking at other opportunities."

10

Six of the accounts that Moline and Hagen handled switched to Collins within days of their departure on July 29, 2004.

Once the Moline team had resigned, Collins personnel called former Moline and Hagen clients and told them that Briner and Moline would work on their accounts once the broker of record letter was received.  Founders' President, Jane Abed, testified that when Patrick Denzer, Collins' CEO, called her to inform her that Hagen had left Benfield, her initial reaction was to move Founders' account to Collins.  She had that reaction because she assumed that Hagen would continue to broker Founders' account.  She would not have made the decision to move the account that quickly if she had known Hagen could not work on it.

Soon after Moline and Hagen began working at Collins, on approximately August 3, they met with Hepper, Briner, and other Collins' employees to discuss the status of accounts "they [we]re sure they [we]re bringing over."  During the meeting, participants discussed key client contacts, special concerns of the accounts, and the structure of the accounts' current coverage from Benfield. Hepper testified that Moline provided some of the information listed.

### b.    Discussion

Moline never asked clients to transfer their business to Collins or encouraged them to discontinue working with Collins.  He did not tell them that he was definitely leaving Benfield or where he might be employed.  Additionally,

Hagen did not solicit clients.  He met with Abed in June and July 2004, and yet she only learned of his resignation after it happened.

Plaintiffs argue that the fact that six of Moline and Hagen's accounts switched to Collins within three business days of their departure demonstrates solicitation because insurance companies do not frequently change reinsurance brokers.  Plaintiffs also rely on <u>Veco Corp. v. Babcock</u>, 611 N.E.2d 1054 (Ill. Ct. App. 1993).  In <u>Veco</u>, the employer not only lost many customers within several days of the employees' termination, it also recovered a "smoking gun:" the employees' detailed, written business plan of how to transfer their employer's business to themselves, including plans to remove copies of "important papers" from the employer's premises.  <u>Id.</u> at 1057-58, 1060.  No such smoking gun exists in this case, and the Court disregards the inadmissible hearsay testimony of Paul Karon regarding alleged statements by Michael Lutz.

The Court grants Defendants' motion for summary judgment as to both Defendants on the claims of breach of contract based on solicitation of clients.  The evidence could not support a verdict that Moline or Hagen solicited clients.  The vague comments from both men to Benfield clients that they were considering leaving cannot constitute solicitation, as there was no attempt to persuade the clients to transfer their accounts to another business.  In fact, neither Defendant mentioned Collins at all.  Solicitation requires some element of

12

attempted persuasion.  Notification of an intent to leave a job is not enough.  See, e.g., Alpha Tax Servs., Inc. v. Stuart, 761 P.2d 1073, 1075 (Ariz. Ct. App. 1988) ("Merely informing customers of one's former employer of a change of employment, without more, is not solicitation.").

Additionally, Plaintiffs' claims cannot be sustained through evidence that Collins called former Benfield clients to inform them that Hagen and Moline had joined Collins.  Collins had no obligation to keep silent, and it utilized Hepper and Briner, who were not under non-solicitation agreements, to make the client calls.  The events of the August 3 meeting are more appropriately addressed in the context of Plaintiffs' claims that Moline and Hagen breached their confidentiality agreements.

### 4.    Confidential Information

Moline and Hagen deny taking any confidential information with them when they left, and Plaintiffs do not allege that they physically took any information.  The parties dispute whether Moline and Hagen passed on confidential client knowledge, gained while at Benfield, to Collins for solicitation and service of former Benfield clients.

Two main events are at issue.  First, the parties dispute the significance of the August 3 meeting discussed above.  Second, Briner sent two emails to Collins personnel recounting the dollar amounts and types of coverage Wisconsin

American had previously purchased through Benfield and its preferences.  Briner

admits using information about Benfield clients that she learned while at Benfield

to work on renewals for those clients at Collins.

Both Moline and Hagen were parties to contracts restricting their use of

Benfield's confidential information.  Their agreements state that they may not

"reveal, report, publish, transfer or otherwise disclose to any person or entity, or

use" Benfield's confidential information.  Hagen's agreement defines confidential

information as "information not generally known that is proprietary to" Benfield

and provides a list of included information, such as Benfield's client lists.  Both

agreements exclude information that becomes general public knowledge from

authorized sources.

The Court grants summary judgment on the claim that Hagen breached his

confidentiality obligation.  The fact that Briner shared information on Benfield's

clients with Collins is irrelevant to claims against Moline and Hagen.  Although

the notes from the August 3 meeting do indicate that Hagen attended that

meeting, Plaintiffs have pointed out no evidence that he provided any confidential

information during the meeting.  Thus, Hagen is entitled to summary judgment.

The Court also grants Defendants' motion for summary as to Moline.  As the

Court noted before, evidence that Briner provided information on Benfield clients

to Collins is irrelevant to claims against Moline.  Plaintiffs do submit evidence that

14

Moline provided information on former Benfield clients at the August 3 meeting.

However, they have failed to show that this information is confidential.

Moline's agreement defines proprietary and confidential information to

include

> trade secrets, information disclosed by customers or potential
> customers of the Company on a confidential basis, risk models,
> product designs, non-public financial information relating to the
> Company, know-how, pricing information which is not a matter of
> industry knowledge, and any other information specified as
> confidential by the Chief Executive Officer or the Board of Directors
> of the Company (the "Board").

Plaintiffs have failed to show that the information revealed at the August 3

meeting fits the above definition.  There is no evidence that the customer

information was disclosed by Benfield's customers on a confidential basis, that the

information was specified as confidential by Benfield, or that it otherwise fit the

contract's definition.

Because the information does not fit the definition of protected information

provided in Moline's contract, the Court looks to the general definition of

confidential information to determine whether the information that Moline may

have provided at the August 3 meeting was confidential.  "Confidential

information is that which an employee knew or should have known was

confidential."  Jostens, Inc. v. Nat'l Computer Sys., Inc., 318 N.W.2d 691, 702

(Minn. 1982).  "[T]he employee is entitled to fair notice of the confidential nature

of the relationship and what material is to be kept confidential." Id. (citation omitted). This Court has previously held that "information as to customers, including knowledge of contact persons, prior purchasing history, and product and service requirements do not constitute trade secrets." Lasermaster Corp. v. Sentinel Imaging, 931 F. Supp. 628, 637 (D. Minn. 1996) (citation omitted). "[S]uch information comprises general skills and knowledge acquired in the course of employment. Those are things an employee is free to take and to use in later pursuits, especially if they do not take the form of written records, compilations or analyses." Id. (citation omitted). In this case, there is no evidence that Moline took any physical files, and, like in Lasermaster, Plaintiffs "proffer[] no persuasive evidence whatsoever to bolster [their] proposition that the information of this type is highly proprietary or confidential." Id. Thus, no reasonable jury could find that Moline disclosed or used Benfield's confidential information.

### 5.    Thirty-Day Notice

Defendants admit that Moline and Hagen did not give thirty days' notice before resigning - they resigned on the same day that they gave notice - but argue that their contracts do not require such notice. The contracts state that after the initial specified term of employment

> the Term of this Agreement shall automatically continue for annual periods thereafter, unless Employer or [Executive/Employee] gives notice of [his or] its intention not to so continue, not less than thirty (30) days prior to the end of the initial term or any subsequent

continuation period.

(Employment Agreements ¶ 1.)

Defendants claim that this clause does not restrict Moline or Hagen's ability to terminate their employment at any time.  However, they offer no alternative interpretation of the thirty-day notice clause other than requiring thirty days notice before termination of employment.  The only other plausible interpretation of the contract is more favorable to Benfield - that employment can only be terminated at the end of the contract term, and then only with thirty days' notice. The Court concludes that Defendants' contracts unambiguously require them to give thirty days' notice before terminating their employment contracts at any time.

Defendants also argue that, even if Moline and Hagen breached their contracts, Benfield cannot establish that it was damaged by their resignations. Four members of the Moline and Hagen team abruptly quit on the same day. Multiple customers quickly switched to Collins, but Benfield no longer had access to their brokers to use in its attempt to keep those customers.  Hepper testified that she knew that this concerted termination enhanced Collins' chances of gaining the team's former Benfield clients.  Plaintiffs argue that the purpose of the thirty-day notice requirement was to have Moline and Hagen available to introduce accounts to new brokers and assist in the transition.  Even if resigning

brokers are often escorted from the premises immediately, they still remain employees for thirty days, required to assist in transition efforts and unable to work for competitors. Clients would have been less likely to immediately switch to Collins, knowing that neither Moline nor Hagen could have worked on their accounts for thirty days.

The Court denies summary judgment on the breach of contract for failure to give thirty days' notice claim as to both Defendants. The contract language unambiguously requires thirty days' notice before terminating employment. Moline and Hagen gave no notice at all. They were unavailable to aid Benfield in transitioning their accounts. Instead, Collins advertised their presence at Collins the same day Benfield scrambled to contact and keep clients. The issue of whether the lack of notice caused clients to switch to Collins, damaging Benfield, is best suited for a jury.

**C.     Counts III and IV, Breach of Fiduciary Duty and Duty of Loyalty (Benfield v. Moline, Hagen)**

Plaintiffs claim that Moline and Hagen breached their fiduciary duty and duty of loyalty by soliciting coworkers to leave at the same time, soliciting clients, and taking confidential information. The Court's analysis of this claim is the same under either Minnesota or Delaware law.

The Court has already determined that Hagen did not solicit clients, use or disclose confidential information, or solicit coworkers. There is no evidence that

Hagen used or disclosed any Benfield information at all.  Plaintiffs do not present evidence that Hagen, as opposed to Hepper or Briner, used Benfield information to woo Benfield clients.  Thus, Count IV, Breach of Fiduciary Duty and Duty of Loyalty against Hagen is dismissed.

The Court determined that Moline did not solicit clients or use or disclose confidential information, but that there is a genuine question of material fact regarding whether Moline solicited his coworkers while still a Benfield employee.  While an employee may conceal his plans to compete with his employer and may prepare to engage in a competing enterprise without breaching his fiduciary duty, "[i]n preparing to compete, an employee may not commit fraudulent, unfair, or wrongful acts, such as . . . solicitation leading to a mass resignation of the firm's employees."  Mercer Mgmt. Consulting, Inc. v. Wilde, 920 F. Supp. 219, 234 (D.D.C. 1996) (citing Science Accessories Corp. v. Summagraphics Corp., 425 A.2d 957, 965 (Del. 1980)).  See also Vigoro Indus. Inc. v. Crisp, 82 F.3d 785, 787-89 (8th Cir. 1996) (holding that under Arkansas law, an employee may notify his fellow workers of his intent to leave but breaches his duty of loyalty when he invites coworkers to join him in a new venture).  Because there is a genuine question of material fact regarding whether Moline solicited his coworkers to leave simultaneously and without notice to join Benfield's competitor, the breach of fiduciary duty and duty of loyalty claim against him survives summary

19

judgment.            Benfield further argues that Moline used Benfield's

information to acquire and maintain Benfield clients after he left Benfield.

Former officers, such as Moline, have a fiduciary duty to not use "fiduciary

confidences" that they gained by virtue of their position with their former

employer to usurp an opportunity from the former employer, even if that

information does not rise to the level of a trade secret.  <u>Long v. Atlantic PBS, Inc.</u>,

681 A.2d 249, 254 n.7 (R.I. 1996) (citing, e.g., <u>Comedy Cottage, Inc. v. Berk</u>, 495

N.E.2d 1006, 1011-12 (Ill. Ct. App. 1986)).  As the Court has noted, Plaintiffs offer

no evidence that the information disclosed at the August 3 meeting is proprietary.

Although the information was gained through employment with Benfield,

Plaintiffs do not offer evidence to show that the information constituted fiduciary

confidences.  Plaintiffs cannot base their breach of fiduciary duty claim on the

allegation that Moline used Benfield's information to gain clients.

### D.   Counts V and VI, Usurpation of Corporate Opportunity (Benfield v. Moline, Hagen)

Plaintiffs assert that Moline and Hagen usurped Benfield's employee and

customer relationships by recruiting Briner and Hepper and by soliciting Benfield

accounts using information obtained in a fiduciary capacity.

The Court must ask two questions when determining whether Defendants

usurped Benfield's corporate opportunity.  The first issue is "whether a business

opportunity presented is also a 'corporate' opportunity, i.e., whether the business

opportunity is of sufficient importance and is so closely related to the existing or prospective activity of the corporation as to warrant judicial sanctions against its personal acquisition by a managing officer or director of the corporation." Miller v. Miller, 222 N.W.2d 71, 81 (Minn. 1974). The second issue is whether the acquiring officer's acquisition of the corporate opportunity "violate[d] his fiduciary duties of loyalty, good faith, and fair dealing toward the corporation." Id. A corporate opportunity is one in which "the corporation has an 'interest' or 'tangible expectancy.'" Alexander & Alexander of N.Y., Inc. v. Fritzen, 542 N.Y.S.2d 530, 534 (N.Y. App. Div. 1989) (citation omitted). "An 'interest' or 'tangible expectancy' has been explained as something 'much less tenable than ownership,' but, on the other hand, more certain than a 'desire' or a 'hope.'" Id.

The Court has already determined that Hagen did not breach his fiduciary duties to Benfield. Thus, a usurpation of corporate opportunity doctrine against him cannot survive summary judgment.

The Court further decided that the only remaining allegation against Moline for breach of fiduciary duty was based on his alleged solicitation of his coworkers. The Court must now decide whether Plaintiffs possessed a tangible expectancy in their at-will employment relationships with Briner and Hepper.

A party can have an tangible expectancy in an at-will employment contract. See Nordling v. N. States Power Co., 478 N.W.2d 498, 505 (Minn. 1991)

21

(recognizing claim for tortious interference with contractual relationship for interference with an at-will employment agreement); Tappe Const. Co. v. Siedow, No. C6-01-731, 2001 WL 1646653, at *4 (Minn. Ct. App. Dec. 26, 2001) (unpublished) (same).  Plaintiffs's at-will employment relationships with Briner and Hepper could constitute corporate opportunities, and there is a question of material fact regarding whether Moline wrongfully usurped that opportunity. Defendants' motion for summary judgment on Plaintiffs' claim for usurpation of corporate opportunity based on Moline's solicitation of Benfield employees while he was an officer of Benfield is denied.

### E. Count VII, Tortious Interference with Benfield's Contracts (Benfield v. Collins)

Plaintiffs assert that Collins tortiously interfered with Moline and Hagen's employment agreements by developing and facilitating a scheme for Moline and Hagen to solicit Benfield clients indirectly and by procuring breaches of their promises not to solicit Benfield employees.

> A cause of action for wrongful interference with a contractual relationship requires: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages.

Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994) (citation omitted).

Defendants assert that the claim fails because there is no evidence that Collins intentionally interfered with Moline or Hagen's contracts and because Collins was

justified in hiring Moline and Hagen.

The Court has already decided that Plaintiffs cannot succeed on their claim that Hagen breached his employment agreements by soliciting Benfield employees or clients.  Thus, Plaintiffs cannot succeed on their claim that Collins procured a breach of Hagen's contracts.  The Court has also determined that Plaintiffs cannot show that Moline breached his contract by soliciting Benfield clients.

The only issue that the Court need now address is whether Collins procured the breach of Moline's contractual obligation to not solicit Benfield employees. Plaintiffs must produce some evidence that Collins intentionally used Moline to solicit Benfield employees in violation of his contract because there is no liability for merely passively permitting him to do so.  See Hagen v. Burmeister & Assocs., Inc., No. C8-98-864, 1999 WL 31130, at *3 (Minn. Ct. App. Jan. 26, 1999) (unpublished) (holding that new employer is not liable for "an employee's breach of a valid noncompete agreement where there was no independent tortious conduct by the new employer" and declining to hold new employer liable when the record disclosed no ratification of the employee's alleged improper conduct).

There is evidence that Collins may have been aware of the solicitation prohibition in Moline's contract because it may have received a copy of that contract in December 2003.  There is also evidence that Collins intentionally aided Moline in breaching that prohibition.  It requested that he identify appropriate

23

employees to target, indicating that it wanted to hire Benfield employees and that
it wanted his help to do so.  It worked with Moline to coordinate the departure
date for the team.   It allowed him to act as Collins' agent in accepting Briner's
acceptance of the Collins job offer.  The question of whether Collins' actions were
justified is generally "largely one of fact for the jury; the standard being
reasonable conduct under all the circumstances of the case."  <u>Bennett v. Storz</u>
<u>Broad. Co.</u>, 134 N.W.2d 892, 900 (Minn. 1965) (citation omitted).  The Court
denies summary judgment on the claim that Collins tortiously interfered with
Moline's contract not to solicit Benfield employees.

 **F.** **Count VIII, Tortious Interference with Benfield's Prospective
   Economic Advantage (Benfield v. Moline, Hagen, Collins)**

  Plaintiffs allege that Defendants tortiously interfered with the reinsurance
arrangements between Benfield and its clients by soliciting those clients in
violation of Moline and Hagen's contracts.  They deprived Benfield of the time
required to establish goodwill with the newly assigned brokers and deprived
Benfield of its reasonably expected commissions.

  In order to prevail on a tortious interference with prospective economic
advantage claim, a plaintiff must prove the following elements:

   1. the existence of a reasonable expectation of economic advantage
   or benefit belonging to Plaintiff;
   2. that Defendants had knowledge of that expectation of economic
   advantage;
   3. that Defendants wrongfully and without justification interfered

with Plaintiffs' reasonable expectation of economic advantage or
benefit;
4. that in the absence of the wrongful act of Defendants, it is
reasonably probable that Plaintiff would have realized his economic
advantage or benefit; and
5. that Plaintiff sustained damages as a result of this activity.

Harbor Broad., Inc. v. Boundary Waters Broad., Inc., 636 N.W.2d 560, 569 (Minn.

Ct. App. 2001).

Defendants argue that Benfield cannot claim a reasonable expectation in an

ongoing brokerage relationship with its clients because it is undisputed that

clients can change reinsurance intermediaries at any time.  Minn. Stat. § 60A.715.

Additionally, they assert that the special competition privilege bars a tortious

interference claim when no improper acts occurred.

Plaintiffs respond that they had a reasonable expectancy of maintaining

their client relationships because reinsurance accounts rarely move.  Additionally,

Collins had been unsuccessful in soliciting the ICH, Georgia Casualty, Diversified

Casualty, and Wisconsin American accounts in prior years.

[I]ntentional interference with prospective contractual relations of a
competitor is not improper if:
(a) the relation concerns a matter involved in the competition
between the actor and the other and
(b) the actor does not employ wrongful means and
(c) his action does not create or continue an unlawful restraint of
trade and
(d) his purpose is at least in part to advance his interest in competing
with the other.

VERTA Corp. v. Cooper Indus., Inc., No. C2-89-1811, 1990 WL 84665, at *2-*3

(Minn. Ct. App. June 26, 1990) (unpublished).  The parties do not dispute that the relation concerns a matter involved in the competition between Benfield and Collins; the action does not create an unreasonable restraint of trade; and Collins' and its employees' purpose was to advance their interest in competing with Benfield.  The only dispute is whether Defendants employed wrongful means to acquire the client accounts.

Collins is permitted to solicit Benfield's clients, to use Briner and Hepper to do so, and to allow Moline to service former clients' accounts.  The Court has already ruled that Moline and Hagen have not improperly solicited former clients.  Because there is no underlying wrong, the Court grants summary judgment on the claim for tortious interference with Benfield's prospective economic advantage.

### G.   Count IX, Conspiracy to Induce Wrongful Breach of Contract (Benfield v. Moline, Hagen, Collins)

"Conspiracy is a combination of persons to accomplish an unlawful purpose or a lawful purpose by unlawful means."  <u>Lipka v. Minn. Sch. Employees Ass'n, Local 1980</u>, 537 N.W.2d 624, 632 (Minn. Ct. App. 1995), <u>aff'd</u>, 550 N.W.2d 618 (Minn. 1996) (citation omitted).  If the underlying tort claim fails, the conspiracy claim must fail as well.  <u>Id.</u>  Plaintiffs' conspiracy claim is based on their allegation that Defendants conspired to breach Moline and Hagen's contracts by failing to provide the thirty-day notice and by indirectly soliciting customers and

employees. The Court has already determined that neither Hagen, Moline, or Collins improperly solicited Benfield's customers or attempted to do so. The conspiracy claim is dismissed insofar as it is based on solicitation of customers.

In order to sustain a finding of conspiracy there must be more than "speculative or conjectural" evidence that "the minds of the alleged conspirators . . . me[]t upon a plan or purpose of action to achieve the contemplated result." Bukowski v. Juranek, 35 N.W.2d 427, 429-30 (Minn. 1948). Plaintiffs claim that even though Moline and Hagen were not directly involved in Collins' solicitation of Benfield clients, they knowingly acquiesced to the solicitation and Moline's presence at Collins was the center of Collins' sales pitch.

The Court already concluded that the tortious interference with contract claim is sustained against Collins based on Moline's solicitation of Benfield employees and that the breach of fiduciary duty and usurpation of corporate opportunity claims based on solicitation of employees are sustained as to Moline. There is evidence that Collins and Moline conspired to solicit Benfield employees and that they conspired to breach Hagen's thirty-day notice provision. Plaintiffs have presented evidence that Moline met with Collins, at Collins' urging; he identified employee targets for it; he encouraged employees to work for Collins, told Collins the departure date, which Collins ordered all of the leaving employees to use, submitted the resignations that were effective immediately, and arranged

with Collins to act as its agent in accepting Briner's acceptance of the Collins job.

Thus, the conspiracy claim against Collins and Moline survives based on

solicitation of Benfield employees and breach of the thirty-day notice provision.

The conspiracy claim is dismissed as to Hagen.  There is no evidence that he

solicited employees, and there is no evidence that Hagen conspired with either

Collins or Moline to do so.  Hagen gave no notice for his termination and

employed the same departure date as Moline, as arranged by Collins.  However,

there is no evidence that he conspired with either Moline or Collins to induce the

breach of any other employee's contract or with Moline to breach his own.  Hagen

did employ the departure date supplied by Collins, but evidence that he actually

conspired with Collins to breach the thirty-day notice requirement is speculative.

Even if Hagen did plan his abrupt departure with Collins, this does not give rise to

a tort claim against him.  Plaintiffs' remedy against Hagen for allegedly breaching

his own contract's notice provision is found in their breach of contract claim.  See

McGreevy v. Daktronics, Inc., 156 F.3d 837, 841 (8th Cir. 1998) (holding that,

under South Dakota law, "one contracting party does not have a cause of action

against the other for conspiring to breach their own contract or for wrongfully

interfering with its own contract" because "when a contracting party does not act

in good faith under the contract, the other party has a remedy under the contract

for breach thereof").

28

### H.      Count X, Unjust Enrichment (Benfield v. Moline, Hagen, Collins)

"To establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled and that the circumstances are such that it would be unjust for that person to retain the benefit."  Mon-Ray, Inc. v. Granite Re, Inc., 677 N.W.2d 434, 440 (Minn. Ct. App. 2004).  The enriched party must gain the benefit "illegally or unlawfully."  Id. (citation omitted).  Further, "[w]here the rights of the parties are governed by a valid contract, a claim for unjust enrichment must fail and summary judgment is appropriate."  Colangelo v. Norwest Mortgage, Inc., 598 N.W.2d 14, 19 (Minn. Ct. App. 1999).  Plaintiffs assert that Defendants have unjustly retained brokerage revenue from former Moline and Hagen Benfield clients, who moved their business to Collins.

There is no argument that the Court should find any portion of Moline and Hagen's contracts unenforceable.  The Court already determined that the restrictive covenants were enforceable in the preliminary injunction context.  The Court dismisses this claim as to Moline and Hagen because valid contracts govern their relationships with Benfield.

There is no contract governing the relationship between Benfield and Collins.  Because Collins wrongfully retained Benfield's brokerage commissions, as

explained in section J, below, the unjust enrichment claim against Collins survives summary judgment.

    **I.**    **Count XI, Unfair Competition (Benfield v. Moline, Hagen, Collins)**

Unfair competition claims are based upon other torts such as breach of a duty of loyalty, tortious interference with contract, and misappropriation of confidential information.  <u>Midwest Sports Mktg., Inc. v. Hillerich & Bradsby of Can., Ltd.</u>, 552 N.W.2d 254, 267 (Minn. Ct. App. 1996).  Because the tort claims against Hagen have been dismissed, the unfair competition claim against Hagen is also dismissed.  Because the breach of fiduciary duty claim remains against Moline, this claim remains as well.  Based on the survival of Plaintiff's tortious interference with contract claim against Collins, this claim against Collin remains.

    **J.**    **Counts XII and XIII, Conversion Claims (Benfield v. Collins)**

        **1.**    **Allegations**

In Count Twelve of their Complaint, Plaintiffs allege that Collins wrongfully converted Benfield's money by inducing insurance clients to transfer their accounts to Collins before the terms of their reinsurance treaties, placed by Benfield, expired.  They claim that Collins has retained commissions out of premium remittances paid on reinsurance coverages that Benfield placed.  Plaintiffs now move for summary judgment on liability only as to Count Twelve.

Defendants move for summary judgment to dismiss this count and Count

Thirteen, which requests declaratory judgment on the ownership of the brokerage

commissions.

### 2.    Factual Background

### a.    Custom and Practice

Benfield is generally compensated for its brokerage work by an up-front

commission or by periodic payment through a percentage deduction from

reinsurance premiums submitted to the reinsurers through Benfield.  The

reinsurer pays the commission.  Reinsurance clients generally do not move their

accounts before treaty renewal period, although they are free to change brokers at

any time.

### b.    Particular Contracts

Benfield asserts that several reinsurance clients followed Moline and Hagen

to Collins, switching their accounts before the expiration of the their reinsurance

treaties: Wisconsin American, ICH, Diversified Casualty, and Founders.  ICH

continued to pay brokerage to Benfield until the end of the treaty period.

Benfield claims that Collins then took over the remission of the insurance

premiums for the remaining accounts to the reinsurers, collecting the premiums,

retaining the commission, and forwarding the remaining portion of the payment

to the reinsurers.

Benfield further asserts that Collins has retained commissions on another former Benfield client, unrelated to Moline and Hagen, who switched to Collins mid-term: Clarendon/Gulf Atlantic.  In 2001, reinsurance broker Charles Ott left Benfield predecessor, E.W. Blanch Company, Inc. ("EWB"), to join Collins.  His Clarendon National Insurance Company account, managed by Gulf Atlantic Insurance Services, moved to Collins with Ott.  There was no restrictive covenant governing Ott's ability to continue to work on the Clarendon/Gulf Atlantic accounts.  Collins and EWB negotiated, but were unable to agree on brokerage sharing.  Because there was no brokerage sharing agreement, Collins received the brokerage revenue on the Clarendon/Gulf Atlantic account following the transfer date out of the reinsurance premiums sent by the client, including the last three quarters of the term placed by Benfield.  Benfield now claims that it is entitled to the brokerage revenue from the last three quarters of that term.

### 3.   Legal Argument

Because Collins does not deny collecting the commission paid on reinsurance treaties places by Benfield and transferred to Collins, the only issue before the Court is which party owns the commissions.  Neither party references or provides any contract relating to the commissions.  It is not clear if there is any written agreement between the reinsurer and the placing broker.

To establish conversion, Benfield must show that it  held a property interest

in the commissions and Collins deprived it of that interest.  Williamson v.

Prasciunas, 661 N.W.2d 645, 649 (Minn. Ct. App. 2003). "Wrongfully refusing to

deliver property on demand by the owner constitutes conversion."  Id. (citation

omitted).

Plaintiffs claim that Benfield had a property interest in the commissions

because a reinsurance broker earns its commission upon the placement of the

reinsurance contracts request by the insurance company client.  They note that

under common law from other jurisdictions, "[a]bsent an agreement to the

contrary, a broker earns its commission when it brings about the relationship of

insurer and insured."  Hamond & Co., Inc. v. Risk Specialists Co. of New York, Inc.,

619 N.Y.S.2d 744, 745 (N.Y. App. Div. 1994).  See also Cockrell v. Grimes, 740

P.2d 746, 749 (Okla. Ct. App. 1987) ("The agent's right to a percentage of the

premium on a policy is a property right which becomes fixed as soon as the policy

is taken out, and then is realized when the premiums are actually paid from time

to time."); Couch on Ins. § 45:3 (2005) ("Absent an agreement to the contrary, a

broker earns its commission when it brings about the relationship of insurer and

insured and the fact that the insurer decides to replace an agent, after policies

have gone into effect, does not affect the broker's right to the agreed upon

commission.")

Plaintiffs argue that primary insurance cases are analogous to the

reinsurance case before the Court.  Like reinsurance brokers, primary insurance brokers assess their clients' needs, assist them with claims submissions, and facilitate communications between the insurer and the insured.  Also, the reinsurance brokerage commission is based on the reinsurance treaty's premium; thus, the client's need for services after the treaty is secured has no effect on the amount of the brokerage commission.  The case law from primary insurance broker cases is clear: unless the contract states otherwise, a broker earns its commission upon creation of the relationship between the insurer and the insured.      Plaintiffs further assert that if brokerage payments were dependent on the broker serving as the broker throughout the year, then brokers who are paid up-front flat fees would have to disgorge those revenues whenever an account moves midterm.  There is no evidence of this practice.

The Court concludes that the general rule for insurance brokerage commissions applies to the reinsurance industry: generally, reinsurance brokerage commissions are earned at placement; if the client switches brokers partway through the insurance contract year, the initial broker is still entitled to those commissions until the treaty renewal period.  Because neither party has submitted any evidence regarding the existence and terms of any contracts governing brokerage commissions, the general presumption applies.  As the placing broker, Benfield is entitled to the brokerage commissions until the end of a treaty term.

**K.      Plaintiffs' Motion to Strike Defendants' Unclean Hand Defense and for Summary Judgment on Defendants' Counterclaims**

**1.      Unclean Hand Defense**

Defendants have raised the affirmative defense of unclean hands.  "Unclean hands is an equitable defense that restricts the availability of equitable remedies to parties who are guilty of unconscionable conduct.  For a successful unclean hands defense, a party's conduct must be unconscionable by reason of a bad motive or because the result brought about by the conduct would be unconscionable."  Progressive Techs., Inc. v. Shupe, No. A04-1110, 2005 WL 832059, at *4 (Minn. Ct. App. Apr. 12, 2005) (unpublished) (citing Fred O. Watson Co. v. U.S. Life Ins. Co., 258 N.W.2d 776, 778 (Minn. 1977); Creative Communications Consultants, Inc. v. Gaylord, 403 N.W.2d 654, 658 (Minn. Ct. App. 1987)).

Defendants allege that Rodman Fox and Paul Karon, former EWB executives suddenly left reinsurance broker, EWB, for Benfield in 2000, taking clients with them.  (Benfield eventually acquired EWB.)  EWB sued Fox, Karon, and Benfield for breach of fiduciary duties and other claims similar to those at issue in this litigation.  (The facts surrounding this incident are laid out in greater detail in the Court's February 23, 2005 Order.  [Docket No. 95])  Defendants now claim that Benfield's position in the Fox and Karon litigation, as well as its role in encouraging Fox and Karon to resign immediately, demonstrate that it has

35

unclean hands in the current litigation.

The Court grants summary judgment to Plaintiffs on the unclean hands affirmative defense.  The unclean hands defense does not apply when the alleged misconduct relates to Fox and Karon, who are not currently parties in this case, occurred five years before Defendants left Plaintiffs' employment, and is unconnected to the transaction in this case.  Minnesota case law has long provided that the doctrine of unclean hands only applies when the previous misconduct occurred within the scope of the facts underlying the current lawsuit. The Minnesota Court of Appeals, in an unpublished opinion, specifically held that an salesman could not introduce evidence that his former employer routinely hired salespeople away from his new employer's partner and allowed them to work for the same customers they had at their previous employer.  Ecolab, Inc. v. Ford, Nos. C0-94-1207, C8-94-1276, 1994 WL 510121, at *4 (Minn. Ct. App. Sept. 20, 1994) (unpublished).  The court noted, "Since [the former employer's] hiring practices regarding other employees concerns a collateral matter, unclean hands is not a defense . . ."  See, also, e.g., Berg v. Carlstrom, 347 N.W.2d 809, 812 (Minn. 1984)  ("[U]nclean hands in a collateral matter is not a defense to equitable relief.") (citation omitted); Everett v. Wallin, 184 N.W. 958, 960 (1921) ("His . . . hands may, perhaps, be somewhat soiled as to others; but that fact does not inure to the benefit of defendant.") (citation omitted); Thompson v. Winter,

43 N.W. 796, 797 (Minn. 1889) (holding that for the doctrine of unclean hands to apply, the alleged conduct "must have some reference to, some connection with, the contract itself, or the duties of the parties in relation to it").

### 2.    Failure to Pay Wages Counterclaim

Moline asserts a counterclaim for failure to pay wages due under Minnesota law.  The statute provides that when an employee "quits or resigns employment, the wages or commissions earned and unpaid at the time the employee quits or resigns shall be paid in full not later than the first regularly scheduled payday following the employee's final day of employment."  Minn. Stat. § 181.14, subd. 1(a).  Defendants claim that Benfield failed to pay Moline his stay and performance formula bonuses after he resigned, despite his written demand for payment.

An earned bonus constitutes wages "[w]hen an employee contracts for a bonus in exchange for his services to the employer, and the right to that bonus vests prior to the employee's termination."  Kvidera v. Rotation Eng'g & Mfg. Co., 705 N.W.2d 416, 423 (Minn. Ct. App. 2005) (addressing the definition of "wages" in section 181.13, which is closely analogous to section 181.14).

A July 2000 Benfield memorandum states that Moline was entitled to a guaranteed $50,000 bonus on December 31 of each year in which he had been employed full time for the entire year, though 2004.  These bonuses were

37

commonly referred to as "stay bonuses" because they reward employees for

staying with the company for that entire year.

The July 2000 memorandum states:

These payments are in addition to any other bonuses to which you
may be eligible.  In other words, you will continue to be eligible for
participation in any other Company bonus or incentive programs that
might be in place during the time period, subject of course to the
eligibility rules of those programs, although the Company reserves
the right to consider these guaranteed bonus payments in deciding
your bonus amounts under those programs.

Moline asserts that, in addition to the stay bonus, he was guaranteed a

yearly performance bonus based on whether Moline, his team, the region, and

Benfield met certain targets.  He asserts, and Benfield does not dispute, that these

specified targets were met; however, Benfield offset the $50,000 stay bonus

against Moline's performance bonus.  Moline submits extrinsic evidence showing

that Benfield brokers believed that they would receive both the stay bonus and

the performance bonus.

The Court concludes the contract's language regarding the stay bonus is

unambiguous: Benfield was permitted to take the stay bonus into account when

making its performance bonus determination.  It was allowed to lower the

performance bonus amount based on the amount of the stay bonus.  When

contract language is unambiguous, extrinsic evidence cannot be considered in

order to create ambiguity.  Hous. & Redevelopment Auth. of Chisholm v. Norman,

696 N.W.2d 329, 337 (Minn. 2005).  The Court grants Plaintiffs' motion for summary judgment on the failure to pay wages counterclaim.

### 3.    Defamation Counterclaim

#### a.    Alleged Statements

Defendants Moline and Hagen have asserted defamation counterclaims based on two statements.  First, they allege that one of Benfield's senior vice presidents, Jeremy Gluck, telephoned Founders President, Jane Abed, at the end of July 2004 or the beginning of August.  He introduced himself and pitched for Founders' renewal.  In the course of the conversation, they discussed Hagen and Hepper leaving Benfield.  Abed told Gluck that the timing could not be worse, because Founders was just starting its reinsurance renewal process.  Gluck responded, "Sometimes, you know, you can be surprised by the integrity of people."  Abed then repeated Gluck's statement to a number of people.

Second, Defendants assert that Moline told Karon that he was unhappy that Benfield was offsetting Moline's stay bonus against his performance bonus, reducing his total compensation.  When later recounting the Moline conversation, Karon told David Cameron, Moline's supervisor, "I don't deal with terrorists."  Cameron repeated the comment to Moline.

#### b.    Legal Analysis of Defamation Claim

In order to prove defamation under Minnesota law, a plaintiff must show

"(1) the defendants published or communicated a statement about her to a third person; (2) the statement was false; and (3) the statement tended to harm her reputation and lower her in the estimation of the community."  Michaelis v. CBS, Inc., 119 F.3d 697, 700 (8th Cir. 1997) (citations omitted).  When deciding whether a statement is defamatory, the Court examines the statement "in the context in which it was presented, give[s] the words their obvious and natural meaning, and consider[s] the innuendos which follow from the statement.  If words are reasonably capable of carrying a defamatory meaning, the determination as to whether the communication was in fact defamatory is for the jury."  Id. (citations omitted).

Statements that cannot be reasonably interpreted to state actual facts are protected by the First Amendment.  Bebo v. Delander, 632 N.W.2d 732, 739 (Minn. Ct. App. 2001).  "Expressions of opinion, rhetoric, and figurative language are generally not actionable if, in context, the audience would understand the statement is not a representation of fact."  Id. (citation omitted).

The Court concludes that Gluck's statement questioning Defendants' integrity is not actionable because it is a matter of opinion that cannot be objectively verified.  See Hunt v. Univ. of Minn., 465 N.W.2d 88, 94-95 (Minn. Ct. App. 1991) (holding that a statement that the plaintiff had trouble dealing with people in her job because she "had no sense of integrity" "is not actionable

40

because it cannot be proven false" and because "it is impossible to objectively verify [the plaintiff's] level of integrity"); see also Northland Merchandisers, Inc. v. Menard, No. C5-96-2177, 1997 WL 408051, at *2 (Minn. Ct. App. July 22, 1997) (unpublished) (holding that a statement that the plaintiff has "'terrible ETHICS' cannot be reasonably interpreted as stating actual facts").

The Court also concludes that Karon's alleged statement that he does not deal with terrorists is not actionable because it is imprecise hyperbole that cannot be objectively verified.  Cf. Thompson v. Campbell, 845 F. Supp. 665, 680 (D. Minn. 1994) (holding that calling plaintiff a "troublemaker" is "too imprecise to be actionable"); McGrath v. TCF Bank Sav., FSB, 502 N.W.2d 801, 808 (Minn. Ct. App. 1993) (same), modified on other grounds by 509 N.W.2d 365 (Minn. 1993); Lee v. Metro. Airport Comm'n, 428 N.W.2d 815, 821 (Minn. Ct. App. 1988) (noting that calling someone a "fascist" is not actionable because the term is indefinite).  In the context of two employees discussing another employee's desire for a particular bonus amount, no reasonable person could interpret the term to suggest verifiable facts about Moline.  Cf. State ex rel. Diehl v. Kintz, 162 S.W.3d 152, 155-56 (Mo. Ct. App. 2005) (holding that the term "trash terrorist" to describe a trash service company was "rhetorical hyperbole" and was not actionable because no reader would infer that the writer was implying that the "company kills and injures people[,] . . . the reader would recognize the language

41

as an epithet used to voice opposition to the proposed trash transfer station").

Thus, the Court grants Plaintiffs' motion for summary judgment on

Defendants' Defamation Per Se counterclaim.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.    Plaintiffs' Motion to Strike Defendants' Unclean Hands Defense and
      for Summary Judgment on Defendants' Remaining Counterclaims
      [Docket No. 122] is **GRANTED**.   Plaintiffs' unclean hands affirmative
      defense is **STRICKEN**.  Defendants' Failure to Pay All Wages Due
      counterclaim, Count I, and Defamation Per Se counterclaim, Count II,
      are **DISMISSED WITH PREJUDICE**.

2.    Defendants' Motion for Summary Judgment [Docket No. 163] is
      **GRANTED IN PART AND DENIED IN PART** as follows:

      a.    Count I - Breach of Contract (Moline) remains only as to the
            issues of solicitation of Benfield employees and failure to
            provide thirty days' notice.

      b.    Count II - Breach of Contract (Hagen) remains only as to the
            issue of failure to provide thirty days' notice.

      c.    Count III - Breach of Fiduciary Duty and Duty of Loyalty
            (Moline) remains only as to the issue of solicitation of Benfield
            employees.

      d.    Count IV - Breach of Fiduciary Duty and Duty of Loyalty
            (Hagen) is **DISMISSED**.

      e.    Count V - Usurpation of Corporate Opportunity (Moline)
            remains only as to the issue of solicitation of Benfield
            employees.

      f.    Count VI - Usurpation of Corporate Opportunity (Hagen) is
            **DISMISSED**.

g.     Count VII - Tortious Interference with Contract (Collins) remains.

h.     Count VIII - Tortious Interference with Contract and Prospective Economic Advantage (Moline, Hagen, and Collins) is **DISMISSED**.

g.     Count IX - Conspiracy to Induce Wrongful Breach of Contract (Collins, Moline, and Hagen) is **DISMISSED** as to Hagen and remains as to Collins and Moline.

h.     Count X - Unjust Enrichment (Moline, Hagen, and Collins) is **DISMISSED** as to Moline and Hagen and remains as to Collins.

i.     Count XI - Unfair Competition (Moline, Hagen, and Collins) is **DISMISSED** as to Hagen and remains as to Moline and Collins.

j.     Count XII - Conversion (Collins) remains.

k.     Count XIII - Declaratory Judgment (Collins) remains.

3.     Plaintiffs' Motion for Partial Summary Judgment on Issue of Conversion of Benfield's Brokerage Commissions [Docket No. 192] is **GRANTED**.

Dated: February 22, 2006          s / Michael J. Davis
                                  Judge Michael J. Davis
                                  United States District Court

43